1
2
3
4
5
6
7
8                        UNITED STATES  DISTRICT COURT

9                          Northern District of California

10                              San Francisco Division

11    CRAIG YATES,                                    No. C 11-01950 LB

12                    Plaintiff,              **FINDINGS OF FACT AND
              v.                              CONCLUSIONS OF LAW**
13
      SWEET POTATO ENTERPRISE, INC., d/b/a
14    Popeyes Store #2794, KUAN L. NG and
      HELEN L. NG, Trustees of THE KUAN L.
15    NG and HELEN L. NG REVOCABLE
      TRUST OF 1993,
16
                    Defendants.
17    _____/

18                                 **INTRODUCTION**

19        This case concerns the accessibility of a Popeyes restaurant in San Francisco to disabled patrons.

20    Plaintiff Craig Yates — who is a triplegic and uses a wheelchair — visited the Popeyes multiple

21    times.  Sweet Potato Enterprise is a franchisee of Popeyes and has been a place of public

22    accommodation since 1986, and the Trust owns the building.  *See* Joint Proposed Findings of Fact,

23    ECF No. 151; Joint Stipulations, ECF No. 135.[1]  Mr. Yates sued the franchisee and the Trust,

24    asserting that the Popeyes restaurant presented him with unlawful architectural barriers in violation

25    of the Americans with Disabilities Act of 1990 ("ADA") (claim one), the California Disabled

26

27    _____

28          [1] Citations are to the electronic case file ("ECF") with pin cites to the electronically
      generated page numbers at the top of the document.

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

Persons Act ("CDPA") (claim two), and California's Unruh Civil Rights Act (claim three).  *See* 6/12/12 First Amended Complaint, ECF No. 19.  He seeks injunctive relief on his ADA and CDPA claims, arguing that the entrance door remains inaccessible and its remediation is readily achievable by the installation of a power door. (In his complaint, he also sought injunctive relief in the form of a lower counter and accessible tables, but Sweet Potato remediated these issues, and Mr. Yates thereafter narrowed his request for injunctive relief to the entrance.  *See* ECF No. 151 at 4.)  Mr. Yates also seeks the minimum statutory damages on his state claims for 13 visits on the following dates: (1) calendar year 2011: March 8, April 12, May 13, June 29, July 20, and September 28;  (2) calendar year 2012:  January 8, March 11, May 14, and August 12; and (3) calendar year 2013: January 12, June 10, and August 21.  *See* ECF No. 50 at 4; ECF No. 137 at 1-2.[2]

All parties consented to the court's jurisdiction.  *See* ECF Nos. 157, 158.  The court held a bench trial on October 6, 2014.  *See* Minute Order, ECF No. 159

Pursuant to Federal Rule of Civil Procedure 52(a), the court (1) issues the following findings of facts and conclusions of law, (2) does not order injunctive relief because Sweet Potato remediated

---

[2]  Mr. Yates limited his claims for damages in a "unilateral stipulation" filed on August 20, 2014 to statutory damages for these visits.  For context, his initial complaint claimed statutory damages for the following visits in 2011: March 8, March 21, and March 30.  *See* ECF No. 1.  His first amended complaint claimed damages for the following visits: (1) 2011: March 8, March 21, March 30, April 5, April 21, April 26, April 30, May 4, May 13, June 29, July 20, September 8, September 28; and (2) 2012: January 8, March 11, and May 14.  *See* ECF No. 19.  In his second amended complaint, he retained these visits, added one more from 2012 (August 24, 2012), and added three from 2013: January 12, June 10, and August 21.  *See* ECF No. 89.  Then, before trial, Mr. Yates dropped his claims for damages for 6 visits in 2011: March 21, March 30, April 5, April 26, April 30, and May 4.  *See* ECF No. 137 at 1-2.

At the initial pretrial conference before Judge Armstrong, which was for a trial on the first amended complaint at ECF No. 19, Mr. Yates agreed to limit his evidence to visits charged in the complaint (meaning, visits up to May 14, 2012) in return for Judge Armstrong's excluding evidence from an August 24, 2012 video.  *See* ECF No. 65 at 8.  Thereafter, the parties stipulated that Mr. Yates could amend his complaint to add the August 24, 2012 and the 2013 visits.  *See* ECF No. 89.  Presumably Sweet Potato acquiesced in this late amendment (well after the October 4, 2012 cut-off for amending pleadings, *see* ECF No. 16) because it had a June 10, 2013 video that was relevant to its argument that Mr. Yates was not denied access.  The court questioned the parties about the late inclusion of new visits and the effect of Judge Armstrong's previous rulings, and all agreed that Mr. Yates could proceed on all visits and Sweet Potato could put in its video evidence.

UNITED STATES DISTRICT COURT
For the Northern District of California

the barriers sufficiently to allow access, (3) limits the universe of compensable visits to seven visits (March 8, April 12, May 13, and June 29, 2011, and January 8, March 11, and May 14, 2012), (4) awards $4,000 in statutory damages for the March 4, 2011 visit, (5) orders a meet-and-confer regarding settlement to take place by November 7, 2014, and (6) orders supplemental briefing on the issue of damages and mitigation on the following briefing schedule: Plaintiff's seven-page brief due November 14, 2014, and Defendants' optional three-page reply due November 20, 2014.

## FINDINGS OF FACT

## I. EVIDENCE AT TRIAL

The general categories of evidence were as follows.  Plaintiff called Plaintiff Craig Yates, experts Rick Sarantschin and Gaylon Gregg, and witness Betty Ogami, who is the daughter of owners and defendants Kuan and Helen Ng.  Sweet Potato called Ms. Ogami, the franchisee Jesse Chen, and expert Thomas Anderson.  The parties submitted joint stipulations of fact (hereafter referred to as "JSF") and joint proposed findings of fact (hereafter referred to as "JFF").  *See* ECF Nos. 135, 151.  These generally relate to Mr. Yates's disability, his visits to the restaurant, the ownership of the restaurant and building, and the restaurant's layout and dimensions at the time of the visits and now.  *See* ECF Nos. 135, 137, and 151.

The parties also submitted a stipulated joint exhibit list.  The exhibits are 1 through 7, 9, 11, 13, 15, 17, 42 through 47 (but only the videos of Mr. Yates), 48, 51 through 54, 59, 62, 65, 69 through 76 (including 70A), and 78 through 82.  *See id.* at 4 (the parties revised and reduced their previous exhibit list by bolding the exhibits bearing these numbers and stipulating that they would be introduced at trial).  Generally, the exhibits are expert reports, photographs and videos, initial disclosures, lease agreements, and schematics.  On the day of trial, the parties stipulated to the admission of five more exhibits, Exhibits 82 to 86 and Exhibit 47A.  Exhibits 82 through 85 are exhibits about changes to the interior of the restaurant in September 2014, Exhibit 86 is an excerpt of Mr. Yates's deposition, and Exhibit 47A is an excerpt of the videos at Exhibits 42 through 47.  At the pretrial hearing, the parties stipulated that their respective experts were qualified under Federal Rule of Evidence 702.  *See* Exhibits 78-80 (expert designations).

UNITED STATES DISTRICT COURT
For the Northern District of California

## II.  PLAINTIFF CRAIG YATES,[3] HIS VISITS TO POPEYES, AND HIS LITIGATION

Mr. Yates is a triplegic who uses a power wheelchair for mobility.  JFF # 5-6; JSF # 6-7.  He is a person with disabilities within the meaning of the ADA and the state statutes.  JSF # 6; Joint Proposed Conclusions of Law (hereafter, "JCL"), ECF No. 151 at 3, # 3.  Mr. Yates uses a power chair, does not have use of three of his extremities, and in particular, cannot use his left arm.

### A.  Mr. Yates's Visits to Popeyes and the Barriers It Posed to Him

Mr. Yates testified that he lives in Marin, visits and shops in San Francisco frequently, and went to the Popeyes in part because he likes the Louisiana flavor of the chicken.  He has receipts from visits to Popeyes # 2794 at 599 Divisadero Street, San Francisco, for the 13 visits at issue on the following dates: (1) <u>calendar year 2011</u>: March 8, April 12, May 13, June 29, July 20, and September 28;  (2) <u>calendar year 2012</u>:  January 8, March 11, May 14, and August 12; and (3) <u>calendar year 2013</u>: January 12, June 10, and August 21.  *See id.;* JSF # 10.  The receipts establish that he visited the Popeyes restaurant on these dates and purchased food and beverage on each occasion.  JFF # 13.  Mr. Yates testified that he visited the restaurant on those dates.

On his visits, Mr. Yates said that he encountered barriers, both getting into the store and when inside it.  The architectural barriers that Mr. Yates complained about in his complaint were a lack of International Sign of Accessibility ("ISA") signage, a lack of an accessible entrance due to narrow doors, excessive door pressure, a lack of a level landing due to a steep slope/ramp of 8% to 12.8%, the lack of handicapped-accessible service counter, the lack of an accessible dining area (meaning, it did not have the required 5% of its tables accessible), and a lack of kick plates on the doors.  *See* Trial Brief, ECF No. 141 at 1 (summarizing First Amended Complaint).  The parties do not dispute the basic facts about signage, door pressure, the landing level, the counter height, and the seating.  These facts are recounted in the next two sections.  The pictures at Exhibits 7, 9, 17, and 51 show the entrance, the double doors, and the slope at the Popeyes at the time Mr. Yates visited it.  JFF # 8.  Exhibit 11 shows the service counter at the time of his visits.  JFF # 11.  Exhibits 13 and 15 depict his path of travel and the dining area at the time of the visits.  JFF # 11.  Exhibits 52 through 54

---

[3]  With the parties' agreement, Mr. Yates testified at trial via video for health reasons.

show the tables at the time Mr. Yates visited.

In his deposition, Mr. Yates said that he never mentioned access issues to anyone on any of his visits.  But he kept receipts to keep track of when changes to the so-called architectural barriers were made.  Deposition, Ex. 86, at 5, 6, 18.  He did not recall whether he told anyone that the tables were not accessible to him.

The next two sections have more facts about the alleged barriers at the entrance and inside.

### 1. The Entrance

The slope of the ramp leading to the entrance of the restaurant ranges from 8.0% to 12.8%.  JFF # 14.  The front entrance of the restaurant does not have a 60" level landing in front of the door.  JFF # 15.  The restaurant's entry has double doors which, when both doors are opened at 90 angles, are 55" wide, or 27.5" per door.  JFF # 16.  These dimensions for the slope, front entrance, and front door existed at the time of Mr. Yates's visits, and they are unchanged now.

Mr. Yates said that he had difficulty getting in the door due to the slope.  He specified that the incline was steep going up to the door, he had to lean forward to grab the door and pull it open, and it was difficult to pull the door and lean at the same time.  The door would close quickly on him, and the door's opening was narrow.  He also said that the door would bang on the wheelchair and the joystick on the right side.  There was a problem with the door pressure.  As he pulled it open, it would close back on him too quickly.  It was a problem exiting the store.  The door's narrowness and the downward slope posed complications.  The doors opened outward.  Exhibit 9 depicts this.

When Mr. Yates visited the store on the dates in question, sometimes the doors were both propped open. He estimated that this happened about five percent of the time.  Employees did not open the doors for him entering into the restaurant but did "a couple of times" when he exited.  On cross examination, he clarified that passerbys helped him gain access one or two times, he never declined help, but no one helped him regularly.  In his deposition excerpts, he said the following about help he received with the door:

Q:  Did anyone at Popeyes assist you with the door on the second visit?

A:  Not that I recall.

Q:  How about on any of the visits, did anyone have to assist you with opening the door?

1    A: There . . . was one of the staff ladies in servicing.  She was an older lady.  And there was
2       quite a few times, I would say two times I can think of, toward the end and visits that she
        assisted that she assisted me with the door.

3  *See* Ex. 86 at 15.

4       Mr. Yates testified that a power door would eliminate the barrier he experienced entering the

5  restaurant.

6       The court found Mr. Yates's testimony about his experiences entering the restaurant to be

7  credible and accepts them as an accurate account about what happened on his visits to the Popeyes.

8           *2. The Interior*

9       The service counter of the restaurant at the time of the visits was 43" high, measured from the

10  floor.  JFF 17.  Plaintiff's expert Rick Sarantschin testified, and Sweet Potato did not dispute, that

11  the ADA Accessibility Guideline ("ADAAG") requires a maximum of 36" above the floor and also

12  defaults to the California Building Code's stricter height requirement of 34."  *See* 8/20/14 Report

13  (citing ADAAG § 7.2 and Cal. Building Code 1122B.1-1122B.4).  The dining area comprised

14  booth-type seating with stationary tables, stationary benches, and stationary chairs from March 8,

15  2011 to August 21, 2013.  JFF # 12.  The tables when Mr. Yates visited "were configured into the

16  booth style and table, and chairs seating which were stationary and affixed to the floor."  JFF # 18.

17  According to Mr Sarantschin, and Sweet Potato did not dispute, two tables that had the ISA logo

18  violated ADAAG 4.32-4.32.4 and 5.1 and Cal. Building Code 1122B.1-1122B.4, which require at

19  least 27" of knee space, and tables with dimensions of 30" wide, 28" to 34" high, and 19" deep.  *See*

20  8/20/14 Report, Ex. 59.  Table 1 had the required 27" of knee clearance, which is the correct height,

21  but it is not fully accessible for wheelchair seating because it is 42" long and 24" wide with fixed

22  benches along the side, and sitting at the accessible 24" end would put the wheelchair user in the

23  path of travel to the service counter.  *Id.*  The second table is 22" long and 24" wide with stationary

24  benches, and again sitting at the accessible end would put the user in the path of travel.  *Id.*,

25      At the trial, Mr. Yates testified about his experiences at Popeyes.  He described how the counter

26  height was too high, and it was not comfortable for his right arm (the only extremity that he can

27  use).  That height affected his ability to sign the credit card receipt: he had to bring it down to his lap

28  to sign it.  Getting food was hard for him because he had to reach for the food he ordered, at the

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

same time dealing with the beverage that he ordered to avoid spilling it on him.  Once he received the food, he would try to hold it in his lap to the right side of his leg.  He always ordered food to go because there was no accessible seating for him.  He did not use the tables there because there were no tables where his wheelchair could fit under.  He would have preferred to eat in the restaurant because it was easier to eat there and discard the remnants as opposed to taking the food to go.  He said that he tried one time to use a booth and one time to use a table.  The wheelchair would not go underneath the table, which meant that it was difficult to eat.  He would have been forced to lean forward, and that set-up increased the likelihood of dropping food on his clothes.

As to the traffic at Popeyes, two people worked at the counter.  Sometimes there were lines out the door on the days when they had specials.  On cross-examination, he estimated that was 15% of the time.  He acknowledged, and the court finds, that there was a sufficient waiting area for him to wait to receive his food.

The defense played a video of Mr. Yates's visit to the Popeyes on June 10, 2013.  *See* Ex. 47A. It shows employees opening the door for him, handing him a credit-card slip to sign on a food tray, bringing him food in a to-go bag, and holding open the door for him as he left; it shows Mr. Yates ordering at the counter, waiting for his food by a table, using his power chair, and getting a drink from the counter.  Mr. Yates said in his deposition that the video showed a typical visit.  Ex.86 at 47:222-25.  The video does not show any struggle or difficulty  getting the food or paying for it.

**B. Mr. Yates and His Prior Litigation**

At trial, Defendants' counsel cross-examined Mr. Yates about his prior litigation consisting of over 189 cases from December 2002 to December 2013 in either state court or federal court raising access claims, all with similar allegations of injury, pain, and suffering as the allegations in the First Amended Complaint.  The implication was that Mr. Yates is a professional litigant.  Mr. Yates did not dispute the extent of his litigation or settlements but disputed that his job (and the way that he makes money) is as a serial litigant.  Instead, he characterized himself as a disability activist.  He also pointed to his record of sending letters before litigation to places of public accommodation. Exhibit 48 contains 68 examples.  Mr. Yates described the process as follows:  he would send letters about barriers, the recipients would fix the barriers, and he would not file a lawsuit.  He

1   acknowledged that he did not send such a letter to this Popeyes because it was a franchise, and he

2   did not make a practice of sending letters to franchises or large restaurant chains such as

3   McDonald's or Popeyes.

### III. THE OPERATION AND OWNERSHIP OF THE RESTAURANT AND BUILDING

5       The Popeyes Store # 2794 restaurant in this litigation has been a public accommodation within

6   the meaning of the ADA since 1986.  *See* JSF # 1; JCL # 1-2.  Sweet Potato Enterprises operates

7   Popeyes Store # 2794, and Mr. Chen is the franchisee.  JSF # 4; JFF # 3.  Kuan L. Ng and Helen L.

8   Ng are trustees of the Kuan L. Ng and Helen L. Ng Revocable Trust of 1993, which owns the

9   building.  JSF # 3; JFF # 4.

10       **A.  The Owners Of the Building**

11       Betty Ogami, the Ngs' daughter, testified at trial because Mr. Ng is not alive and Mrs. Ng is

12   elderly and too infirm to testify.  JSF # 10.  The parties stipulated that under the circumstances, Ms.

13   Ogami's testimony would have the same force and effect as her mother's testimony.  *Id*.  She

14   testified about the revenue stream that the trust received from the Popeyes.  *See* Exs. 1, 70.  Since

15   1992, the property has had no mortgage.  Rent from 1992 to 2012 was $953,114.35.  Broken down

16   annually, it started at $36,750 in 1992 and increased over the years to $58,039.80 in 2012.  *Id.*

17       Ms. Ogami testified about her parents' financial circumstances.  Her mother Helen Ng is 85, and

18   her father Kuan Ng died in 2013 at age 84 of prostrate cancer.  He had been treated for the cancer

19   since 2005.  The parents lived in one-third of a triplex in Redwood City for more than 30 years, and

20   they own it with Ms. Ogami's sister.  The mortgage on the triplex is about $1,000 per unit.  They

21   rent out the other two units.  Mr. Ng was a paint tester for Sherwin Williams and was a security

22   guard at San Francisco Airport before that.  He retired at the age 59 for health reasons.  Mrs. Ng

23   worked at Esprit as an order picker in the garment factory and retired at age 65.  She had liver cancer

24   and required special medical treatment.  The parents were very frugal, saved every penny to buy the

25   building on Divisadero Street, used the rental income to pay their mortgage and live, and had only

26   their social security income as other income.  Her parents did not contribute any money for the re-

27   imaging of Popeyes that is discussed in the next section.  She did not know whether her parents

28   knew or used IRS code 44 or 199 for a tax credit or tax reduction for putting in ADA access to the

UNITED STATES DISTRICT COURT
For the Northern District of California

C 11-01950
FINDINGS OF FACT AND CONCLUSIONS OF LAW

1   Divisadero property.  She does not object to a power door being installed on the property.

2   **B.  The Franchisee Sweet Potato**

3   Mr. Chen was the CEO of Sweet Potato and became the CFO recently.  The franchise initially

4   was his father's starting in 1986, and his family has controlled it since.  He came on board around

5   2008.  His father ran it until he died in 2004, and his mother ran it after that.  Since he took over the

6   business, no one identified any architectural barriers at the business to him before this lawsuit.

7   Since 1990, his gross revenue is under a million dollars a year on average.  He and his wife work

8   there full time, he takes home about $30,000, she takes home around $15,000, and for the past

9   several years, his mother has taken home nothing.  At times since 2008, there was not enough money

10  to run the business, and several times he had to use his personal credit card to lend the business

11  money for things such as a refrigerator.

12  Popeyes told him in 2010 or 2011 that he had to do a re-imaging of the store (essentially, a re-

13  design and updating of the style of the store), but he could not get a bank loan to do the re-imaging.

14  Mr. Chen tried to get a loan for the estimated $80,000 re-imaging from Wells Fargo and Bank of

15  America, but they rejected him.  The reasons were that his sales were not profitable, this litigation

16  created exposure, and he did not meet certain indexes such as amount of cash profit. Mr. Chen's

17  older brother has other Popeyes stores in the area, and he re-imaged his stores quickly.  Popeyes

18  required him to put his brother in charge to accomplish the re-imaging, and he made his brother

19  CEO.  They ultimately obtained a bank loan that allowed them to accomplish the re-imaging and the

20  remediation in the next section.

21  **IV.  THE CHANGES TO THE RESTAURANT AS OF SEPTEMBER 22, 2014**

22  Since Mr. Yates's visits to the Popeyes, and as of September 22, 2014, the parties' last

23  inspection, the interior of the restaurant is  now ADAAG compliant: the service counter has been

24  lowered to 34 inches, the dining room tables are the requisite 5% accessible, and there is the

25  appropriate ISA signage.  *See* JCL # 5-6.  The pictures show the required ISA signage.  Mr. Chen

26  testified that he implemented the changes as part of the re-imaging of the store that the national

27  franchisor Popeyes required of its franchisees, including Sweet Potato.  It is essentially a redesign of

28  how the interior looks.  Popeyes characterizes it as a "new image package for our restaurants" that is

UNITED STATES DISTRICT COURT
For the Northern District of California

"modern and communicates our Louisiana roots and culinary history to our guests" and gives "our restaurants a refreshed appearance and curb appeal . . . at a very favorable cost." *See* Ex. 84 at Bates SP00048.  The re-imaging was required by the franchise agreement. *Id.*

So far, Sweet Potato has spent $74,000.  Exhibit 84 is a collection of the invoices, including those for work on the counter and seating.  Other receipts such as cancelled checks, cash receipts, and receipts for minor stuff such as Home Depot expenses are not included.  Mr. Yates first came into the store in 2011, and Mr. Chen acknowledged that it took 43 months before he remediated the alleged access issues.  He attributes the delay to his difficulty getting a loan.

Mr. Yates put in evidence via his expert that appending a lower shelf to the counter would cost $150, and an accessible table would cost $1,000.  Mr. Chen said that he did not consider changes such as a separate table or a fold-down counter to make the store ADA compliant because Popeyes does not allow him to implement anything other than its approved designs.  He did not, however, talk to the franchisor about his need to implement ADA changes because (he said) they have their architects to do their designs, they were not on speaking terms with Mr. Chen due to his delays in the re-imaging, and they cut him out and brought in his brother to accomplish the re-imaging.

Plaintiff's expert Gaylon Gregg opined about the re-imaging, saying that many of the changes would have required a permit.  He looked at Exhibit 83, which discussed the changes to the service counter, and said that it was a pretty large counter top, needed to be weight bearing, and needed some kind of anchoring to the wall.  He said that "[a]s far as I know, this . . . would require a permit."  He also looked a Exhibit 76F, and its discussion of electrical work.  *See* Ex. 76F at 1-5.  He opined that the large circular suspended soffit on page 4 would have to be suspended securely to whatever was above it, and that would require a building permit.  Similarly, he opined, the pendant lighting floor tile accent soffit on page 6 would require permitting.  He included that the re-imaging was in fact a remodel that would trigger the need to provide an accessible entry under the ADA.

Sweet Potato's expert Tom Anderson testified about his 2011 cost estimate for the ADA remediation.  *See* Ex. 71.  His total estimate was $36,482.  He is a licensed contractor, builds commercial office spaces and residential structures, and does tenant improvements for clients and on his own projects. He has been a licenced contractor since 1974, knows what his daily costs are,

1   needs to make accurate bids to survive, and believes that his estimate of roughly $36,000 for the full

2   remediation is more realistic than Plaintiff's estimate of $11,000 or $12,000.  He does not believe

3   that the work could be done for the amount Plaintiff suggested.  He also opined about whether the

4   re-imaging required permits.  He testified that the Uniform Building Code gives the inspector

5   discretion and agreed that structural work, including load bearing walls, needed permits.  But he

6   characterized the re-imaging as a tenant improvement, an interior renovation, and interior decorator

7   kind of work. Whether a permit would be required for this project would be discretionary with the

8   building department, and he did similar work or even greater without obtaining a permit.

9       On this record, the court finds that the re-imaging was cosmetic and akin to interior decoration.

10  In particular, the court credits Mr. Anderson's testimony, given his extensive boots-on-the-ground

11  experience in the industry.

12  **V.  EVIDENCE AND TESTIMONY ABOUT REMEDIATION OF THE ENTRANCE**

13      The sole remaining issue for ADA injunctive relief is the accessibility of the door and the

14  entrance. The entry measurements are as follows: (1) the slope of the ramp leading to the entrance of

15  the restaurant ranges from 8.0% to 12.8%; (2) the front entrance of the restaurant does not have a

16  60" level landing in front of the door; and (3) the restaurant's entry has double doors which, when

17  both doors are opened at 90 angles, have an entry space that is 55" wide, or 27.5" per door.  JFF #

18  14-16. Plaintiff's expert Rick Sarantschin testified, and Popeyes did not dispute, that (1) the landing

19  slope violates ADAAG § 4.13.6, which requires a level landing in front of the entrance door, and (2)

20  the door opening violates ADAAG §§ 4.13.4 and 4.13.5 and California Building Code 1133B.2.3.1,

21  which require a minium clear opening of 32" with the active door panel open at 90 degrees.  *See*

22  8/20/14 Inspection, Ex. 59.  The right door panel at the entrance requires 7 to 8 pounds of force to

23  open it, which the parties do not dispute violates ADAAG § 4.13.11 and California Building Code

24  1133B.2.5, which require a maximum of 5 pounds of force for exterior doors if  the door is not a fire

25  door.  *See id.*  The parties stipulated, and the court finds, that it is not "readily achievable" for

26  defendants to provide an entrance with a level landing.  *See* JCL # 4.

27      Plaintiff's expert, who testified that 99% of his business is for Plaintiff's counsel, said in his

28  report that the landing required remediation, requiring Popeyes to work with the City of San

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1  Francisco to raise the sidewalk or install a ramp. *See* Ex. 3, 7/21/11 Report, at 2.  At trial, he said

2  that this was a mistake and that his report should have read that Popeyes could not put in a ramp.

3  The entrance is shown in Exhibit 82.  It is unchanged from the time of Mr. Yates's visits, except

4  that as of August 20, 2014, there is a bell installed with an ISA sign saying, "Please ring bell for

5  assistance."  (The bell does not appear on a photograph of the entrance date-stamped January 9,

6  2013.  *See* Ex.9.)  At trial, Plaintiff's expert Rick Sarantschin testified that when he rang the bell, no

7  one answered it.  Mr. Chen testified that there was a clear view from the service counter to the door,

8  and his employees always answer the bell if someone needs assistance getting into the restaurant.

9  The court credits and accepts Mr. Chen's representation.

10  **A.  Plaintiff's Evidence About Cost of Remediating the Entry**

11  Plaintiff's expert Gaylon Gregg testified about remediation.  He is an architect who went to U.C.

12  Berkeley and a licenced contractor.  He testified that to install a power door using the two existing

13  doors, it would cost $3,100.  *See* Ex. 2.  He considered Sweet Potato's estimate for the door of

14  $5,850, involving installation of a front door that was ADA compliant with an automatic opening

15  and said that was more like a gold standard.  He opined that a regular door with 32" clearance would

16  cost $640, based on 4 hours of carpentry and $310 in materials, door, and closer.

17  **B.  Defense Evidence About Cost of Remediation Of the Entry**

18  Exhibit 84 at page 73 is the proposal for a power door.  It includes remote and handicapped

19  pushing (meaning, it is a power door), and it is ADA compliant. Mr. Chen obtained the proposal,

20  which is for $5,850, on September 30, 2014, and he intends to install the door.  When he got the

21  quote, he was told that electrifying the existing doors would require two electric openers, and the

22  doors are old and the frames are rubbed together.  He believes that his bid is the most cost-effective

23  and best option, and it was the lowest bid he got.  He testified that he is able to install the door now

24  because he obtained financing for the re-imaging.  He agreed that he could have afforded the

25  remediation of the door but said that his business declined severely starting in 2008, the area is

26  gentrifying, he had to do the re-imaging and could not afford to do it, and he got stuck not knowing

27  what to do.

28

C 11-01950
FINDINGS OF FACT AND CONCLUSIONS OF LAW

UNITED STATES DISTRICT COURT
For the Northern District of California

1

**CONCLUSIONS OF LAW**

2  **I.   DISCRIMINATION UNDER TITLE III OF THE ADA (CLAIM ONE)**

3       Mr. Yates sues for injunctive relief under the ADA.  Since Mr. Yates's visits to the Popeyes, the

4  service counter has been lowered and is now ADAAG compliant, and the dining room tables are the

5  requisite 5% accessible and also are ADAAG compliant.  *See* JCL # 5-6.  It is not "readily

6  achievable" for defendants to provide an entrance with a level landing.  *See* JCL # 4.  Mr. Yates now

7  argues that the entrance itself is a barrier, the slope is not ADA compliant, and remediation in the

8  form of a power door is readily achievable to overcome the slope at the entry landing.  *See*

9  Plaintiff's Separate Disputed Facts, ECF No. 139.

10      **A.   Prohibited Discrimination**

11      Title III of the ADA prohibits discrimination against disabled individuals in public

12  accommodations.  42 U.S.C. § 12182(a).  Landlords and tenants are both liable for failing to provide

13  accessible facilities at public accommodations.  28 C.F.R. § 36.201(b).

14      To recover on an ADA discrimination claim, a plaintiff must prove that (1) he or she is disabled

15  within the meaning of the statute, (2) the defendants are private entities that own, lease (as landlord

16  or tenant), or operate a place of public accommodation, and (3) the plaintiff was denied public

17  accommodation by the defendants because of his or her disability.  *Arizona ex rel. Goddard v.*

18  *Harkins Amusement Enters., Inc.*, 603 F.3d 666, 670 (9th Cir. 2010).  Here, the parties have

19  stipulated that the first two elements have been met.  *See* JCL # 1-3.  Thus, the parties dispute only

20  whether the third element has been satisfied, meaning, whether Mr. Yates was denied public

21  accommodation.

22      The third element is satisfied when there has been a violation of applicable ADA accessibility

23  standards. *Chapman v. Pier I Imports (U.S.), Inc.*, 631 F.3d 939, 945 (9th Cir. 2011).  In general, a

24  public accommodation is accessible under the ADA if it meets the requirements that the U.S.

25  Attorney General has promulgated in the "ADA Accessibility Guidelines" (or "ADAAG"), which is

26  "essentially an encyclopedia of design standards." *Oliver v. Ralphs Grocery Co.,* 654 F.3d 903, 904-

27  05 (9th Cir. 2011); *see* 28 C.F.R. § 36.406; 28 C.F.R. pt. 36, app. A.  Title III's accessibility

28  standards come in three broad categories: (1) the "new construction" provisions apply to public

1  accommodations first occupied after January 26, 1993; (2) the "alteration" provisions apply to post-

2  January 26, 1992 changes to buildings that existed as of that date; and (3) the "readily achievable"

3  provisions apply to unaltered parts of buildings that were built before January 26, 1992. 28 C.F.R.

4  §§ 36.401, .402; *see also Moeller v. Taco Bell Corp.*, 816 F. Supp. 2d 831, 847 (N.D. Cal. 2011).

5  *1. Preliminary Issue: Altered Or Existing Building*

6  At least until the September 2014 re-imaging, the parties did not dispute that the building here is

7  an "existing building" under the ADA, and that it was constructed before and not altered after

8  January 26, 1992.  At the trial, Plaintiff's counsel asserted that the re-imaging is an "alteration"

9  within the meaning of the ADA.  If it is an alternation, then the alteration triggers a heightened

10  obligation to ensure that "altered proportions of the facility are readily accessible to and usable by

11  individuals with disabilities, including individuals who use wheelchairs."  42 U.S.C. § 12183(a)(2).[4]

12  The ADA does not define alteration.  Given the lack of a statutory definition, courts look for

13  guidance to the Department of Justice, which promulgates regulations regarding Title III's public

14  accommodation provisions (section 12186(b)), issues technical assistance letters explaining the

15  law's requirements (section 12206(c)), and enforces Title III in court (section 12188(b)).  *See*

16  *Rodriguez v. Barrita, Inc.*, No. C 09-04507 RS, ECF No. 250 at 19 (N.D. Cal. Jan. 1, 2014).  The

17  DOJ's ADA Architectural Guidelines provide the following:

18      [A]n alteration is a change to a place of public accommodation or a commercial facility that
    affects or could affect the usability of the building or facility or any part thereof.

19

20      (1) Alterations include, but are not limited to, remodeling, renovation, rehabilitation,
    reconstruction, historic restoration, changes or rearrangement in structural parts or elements,
    and changes or rearrangements in the plan configuration of walls and full-height partitions.

21      Normal maintenance, reroofing, painting or wallpapering, asbestos removal, or changes to
    mechanical and electrical systems are not alterations unless they affect the usability of the

22      building or facility.

23  Appendix A to 28 C.F.R. § 36.402; *see Rodriguez*, ECF No. 250 at 20 n.13 (according the ADAAG

24  *Chevron* deference because it was promulgated in exercise of the DOJ's statutory authority to issue

25  regulations implementing Title III's public accommodation provisions).

26  _____

27      [4]  In his post-trial brief, Mr. Yates did not argue that the re-imaging was an alteration and
instead cited only the "readily achievable" standard.  *See* ECF No. 164.  Given the argument at the

28  hearing, and in an abundance of caution, the court addresses the issue anyway.

UNITED STATES DISTRICT COURT
For the Northern District of California

The concept of usability is central to determining whether an alteration has been made. *Rodriguez*, ECF No. 250 at 20 (citations omitted). Here, Plaintiff's expert pointed only to the need for permits as establishing that the re-imaging was an alteration. By contrast, Sweet Potato's expert characterized permits for work like the work here as discretionary with the building department, said in any event that he did similar work without permits, and described the work as interior decoration.

On this record, the court concludes that the work is akin to design re-imaging (such as painting, wall papering, and interior decoration) and is not like installing new fixtures or reconstructing walls. It involves new lights, counters, and tables, but those are design elements required by the franchisor and implemented at its instructions. Popeyes characterizes it as a "new image package for our restaurants" that is "modern and communicates our Louisiana roots and culinary history to our guests" and gives "our restaurants a refreshed appearance and curb appeal . . . at a very favorable cost." *See* Ex. 84 at Bates SP00048. The re-imaging is not about the structure and is about the fixtures in it.

Thus, the "readily achievable" accessibility standard applies to the issue of whether the entrance is an architectural barrier.

### 2. *Readily Achievable Standard*

Architectural barriers must be removed only where this is "readily achievable." 42 U.S.C. § 12182(b)(2)(A)(iv). Removing barriers is "readily achievable" when it can be "easily accomplish[ed]" and "carried out without much difficulty or expense." 42 U.S.C. § 12181(9). In determining whether an action is "readily achievable," factors to be considered include:

A. the nature and cost of the action needed under this chapter;

B. the overall financial resources of the facility or facilities involved in the action; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such action on the operation of the facility;

C. the overall financial resources of the covered entity; the overall size of a business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and

D. the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative or fiscal relationship of the facility or facilities in question to the covered entity.

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1   *Id.*  What is readily achievable is evaluated on a case-by-case basis.  28 C.F.R. § 36.304. The

2   ADAAG gives some examples of "modest measures that may be taken to remove barriers that are

3   likely to be readily achievable":  (1) installing ramps; (2) making curb cuts in sidewalks and

4   entrances; (3) repositioning shelves; (4) rearranging tables, chairs, vending machines, display racks,

5   and other furniture; (5) repositioning telephones; (6) adding raised markings on elevator control

6   buttons; (7) installing flashing alarm lights; (8) widening doors; (9) installing offset hinges to widen

7   doorways; (10) eliminating a turnstile or providing an alternative accessible path; (11) installing

8   accessible door hardware; (12) installing grab bars in toilet stalls; (13) rearranging toilet partitions to

9   increase maneuvering space; (14) insulating lavatory pipes to prevent burns; (15) installing a raised

10  toilet seat; (16) installing a full-length bathroom mirror; (17) repositioning the paper-towel dispenser

11  in a bathroom; (18) creating designated accessible parking spaces; (19) installing an accessible paper

12  cup dispenser and an existing inaccessible water fountain; (20) removing high-pile, low-density

13  carpeting; or (21) installing vehicle hand controls.  *See id.* § 36.304(b).

14      When an entity demonstrates that the removal of an architectural barrier is not readily

15  achievable, it nonetheless discriminates against persons with disabilities if it fails to "make such

16  goods, services, facilities, privileges, advantages, or accommodations available through alternative

17  methods if such methods are readily achievable.  42 U.S.C. § 12182(b)(2)(A)(v).  "Such measures

18  include, for example, providing a ramp with a steeper slope or widening a doorway to a narrower

19  width than that mandated by the alteration requirements.  No measure shall be taken, however, that

20  poses a significant risk to the health or safety of individuals with disabilities or others." 28 C.F.R.

21  § 36.304(D)(3).

22      The flexible nature of the "readily achievable" standard takes into account the "imperfect

23  realities of disability access law compliance."  *Rodriguez v. Barrita, Inc.*, No. 09-CV-4057-RS, 2014

24  WL 31739, at *14 (N.D. Cal. Jan. 3, 2014).

25      **B.  Burden of Proving That Removal of a Barrier is "Readily Achievable"**

26      "The Ninth Circuit has yet to rule on whether the plaintiff or defendant bears the burden of proof

27  in showing that removal of an architectural barrier is readily achievable, [but] the Ninth Circuit and

28  several district courts within the Ninth Circuit have applied the burden-shifting framework set forth

1    in *Colorado Cross Disability Coalition v. Hermanson Family, Ltd.*, 264 F.3d 999 (10th Cir. 2001)."

2    *Yates v. Bacco*, No. C-11-01573 DMR, 2014 WL 1089101, *5 (N.D. Cal. Mar. 17, 2014) (citation

3    and quotation omitted).  This court follows the "overwhelming majority of federal courts that apply

4    the burden-shifting framework of *Colo[rado] Cross*."  *Id.* (citation and quotation omitted).

5    In *Colorado Cross*, the Tenth Circuit held that the plaintiff bears the initial burden of (1) proving

6    the existence of an architectural barrier and (2) suggesting a method of removing the barrier that is

7    "readily achievable," that is, "easily accomplishable and able to be carried out without much

8    difficulty or expense." *Colorado Cross*, 264 F.3d at 1002–03; 42 U.S.C. § 12181(9); *Hubbard v.*

9    *Rite Aid Corp.*, 433 F. Supp. 2d 1150, 1159 (S.D. Cal. 2006).  If the plaintiff does this, the burden

10   shifts to the defendants to show that removing the barrier is not readily achievable.  Defendants

11   "bears the ultimate burden of persuasion that barrier removal is not readily achievable . . . ."

12   *Colorado Cross*, 264 F.3d at 1002-03; *see also Strong v. Valdez Fine Foods*, No.

13   09–CV–1278–MMA JMA, 2011 WL 455285 (S.D. Cal. Feb. 4, 2011), *rev'd on other grounds*, No.

14   11–55265, 2013 WL 3746097 (9th Cir. July 18, 2013).

15   Some courts have offered guidance on how a plaintiff may meet his initial burden of proving that

16   an architectural barrier exists and suggesting a readily achievable method for its removal. *See, e.g.*,

17   *Gathright–Dietrich v. Atlanta Landmarks, Inc.*, 452 F.3d 1269, 1274 (11th Cir. 2006) ("[A] plaintiff

18   must present sufficient evidence so that a defendant can evaluate the proposed solution to a barrier,

19   the difficulty of accomplishing it, the cost implementation, and the economic operation of the

20   facility"); *Pascuiti v. New York Yankees*, No. 98–CV–8186 SAS, 1999 WL 1102748, at *4

21   (S.D.N.Y. Dec. 6, 1999) (a plaintiff "must consider the four factors identified in 42 U.S.C.

22   § 12181(9) and proffer evidence, including expert testimony, as to the ease and inexpensiveness of

23   their proposed method of barrier removal"); *Colorado Cross*, 264 F.3d at 1009 (plaintiff failed to

24   satisfy its initial burden where its expert provided only speculative conceptual sketches for the

25   proposed modification rather than a specific design which would be easily accomplishable and able

26   to be carried out without much difficulty or expense).

27   **C.  Whether Remediation Of The Entrance is Readily Achievable**

28   The issues are (1) whether the door is a barrier, (2) whether Plaintiff's suggested method of

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

addressing the barrier improves access, and (3) whether Plaintiff's method is "readily achievable."

### 1. Is the Entrance a Barrier?

Mr. Yates testified about his difficulties opening the door, and it is undisputed that the door was not ADAAG compliant in that it was too narrow and the force required to open it was too much. (Leveling the slope is not readily achievable.)

Sweet Potato argues that Mr. Yates was not denied access, relying on the video showing his receiving the restaurant's services with no discernable difficulty. *See* ECF No. 165 at 4-5. But the video shows an employee opening the door for Mr. Yates, a situation that he testified was rare. *See supra*.

The court finds that Mr. Yates met his burden of establishing a barrier.

### 2. Does Plaintiff's Suggested Method Improve Access?

Mr. Yates also met his burden of proposing a power door as a means of providing access. He proposed a solution of power door hardware using the two existing doors for a total of $3,100. *See* Ex. 2.

### 3. Is Plaintiff's Method Readily Achievable?

The court finds that installing the door was readily achievable. Examples in the ADAAG include widening doors and installing accessible door hardware. *See* 28 C.F.R. § 36.304(b). Sweet Potato nonetheless argues that it did not deny access because its employees' assisting Mr. Yates is analogous to curbside service, which the ADAAG recognizes as an alternative method to barrier removal. *See* 28 C.F.R. § 36.305(b). That does not take away from the actual barrier that Mr. Yates experienced on his visits when employees did not assist him. That being said, for purposes of injunctive relief under the ADA, some time after Mr. Yates's last visit and by August 20, 2014, Sweet Potato installed a bell with an ISA sign saying, "Please ring bell for assistance." The undisputed evidence is that there is a clear view from the counter to the door and bell, and Mr. Chen's employees now always help those in need of assistance by opening the door, among other things.

The bell and the employees' holding the door fix the issue. The claim for injunctive relief thus is moot. Also, the court credits and accepts Mr. Chen's representation that he will install the power

UNITED STATES DISTRICT COURT
For the Northern District of California

1   door shortly and expects that he will do so.

2       Because the court finds, however, that Mr. Yates encountered a barrier on the occasions when

3   employees did not open the door or help him, it turns to his claims for damages.

4   **II. STATE-LAW CLAIMS**

5       Mr. Yates seeks statutory damages under state law.  The next sections set forth the standards and

6   award Mr. Yates damages.

7       **A. The Unruh Civil Rights Act — Cal. Civ. Code § 51 (claim three)**

8       The Unruh Act outlaws arbitrary discrimination in public accommodations, including

9   discrimination based on disability. Cal. Civ. Code § 51(b); *Jankey v. Sung Koo Lee*, 55 Cal. 4th

10  1038, 1044 (2012).  In the disability context, the Unruh Act operates virtually identically to the

11  ADA.  *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 731 (9th Cir. 2007).  Any violation of the ADA

12  necessarily constitutes a violation of the Unruh Act.  *Id.* (citing Cal. Civ. Code § 51(f)).  Where the

13  basis of liability for an Unruh Act violation is an ADA violation, plaintiff need not prove intentional

14  discrimination.  *Munson v. Del Taco, Inc.*, 46 Cal. 4th 661, 678 (2009).

15      The Unruh Act allows for monetary damages including automatic minimum penalties in the

16  amount of $4,000, and attorney's fees as "may be determined by the court." Cal. Civ. Code § 52.

17  Proof of actual damage is not required to recover statutory minimum damages. *See*, *e.g.*, *Botosan v.*

18  *Paul McNally Realty*, 216 F.3d 827, 835 (9th Cir. 2000).

19      **B. The California Disabled Persons Act ("CDPA") — Cal. Civ. Code § 54 (claim two)**

20      The CDPA complements and substantially overlaps the Unruh Act, although the CDPA is

21  narrower in focus. *Jankey*, 55 Cal. 4th at 1044.  It ensures that people with disabilities have equal

22  rights of access "to public places, buildings, facilities and services, as well as common carriers,

23  housing and places of public accommodation." *Id.* at 1044–45 (citation omitted).  As with the Unruh

24  Act, the California Legislature amended the CDPA to incorporate ADA violations and make them a

25  basis for relief under the act. *Id.*; Cal. Civ. Code §§ 54(c), 54.1(d).

26      The CDPA allows monetary damages for each offense "up to a maximum of three times the

27  amount of actual damages but in no case less than" $1,000, as well as attorney's fees "as may be

28  determined by the court." Cal. Civ. Code §§ 54.3(a), 55.  Recognizing the overlap between the

1   Unruh Act and the CDPA, the Legislature expressly foreclosed recovery under both acts.  Cal. Civ.

2   Code § 54.3(c).

3       **C.  Limits on Unruh Act and CDPA Damages and the Damages Awarded Here**

4       California Civil Code § 55.56 requires that a plaintiff seeking statutory damages under the Unruh

5   Act or the CDPA show that the violation denied the plaintiff "full and equal access," which can

6   occur either if (1) the plaintiff "personally encountered" the barrier on a particular occasion or if (2)

7   the plaintiff was deterred from accessing that place of accommodation on a particular occasion.  *See*

8   Cal. Civ. Code § 55.56(a)-(b).

9       As to the first circumstance, personally encountering a barrier may be sufficient to give rise to

10  damages if "the plaintiff experienced difficulty, discomfort, or embarrassment because of the

11  violation."  *Id.* § 55.56(c).  A plaintiff proceeding under this provision "must offer evidence of

12  difficulty, discomfort, or embarrassment in relation to his personal encounter of a barrier in order to

13  recover damages under the Unruh Act or the DPA."  *Kohler v. Presidio Int'l Inc.*, No. 10-c-4680-

14  PSG PJWX, 2013 WL 124601, at *7 (C.D. Cal. Mar. 25, 2013) (citations omitted).

15      As to the second circumstance, a deterrence gives rise to damages only if (1) the plaintiff had

16  actual knowledge of a violation and (2) the violation would have actually denied the plaintiff full

17  and equal access if he attempted to access the place on a particular occasion.  Cal. Civ. Code.§

18  55.56(d).

19      Here, the court holds that Mr. Yates personally encountered a barrier at the entry on the

20  occasions when employees did not open the door for him or the doors were not propped open.  He

21  testified about the difficulty that opening the door on a slope posed for him, and the evidence about

22  the slope approaching the door, the door's width, the force required to open it, and Mr. Yates's own

23  physical limitations support his testimony.  He seeks damages for 13 of his 20 visits but

24  acknowledged that on a few occasions, employees held the door open for him, especially toward the

25  end.  The video from June 10, 2013 shows this.  Mr. Yates variously estimated the number of times

26  as "quite a few," 15%, or a couple of times.  He also said that 5% of the time, both doors were

27  propped open.  Five percent of twenty visits is one time, and if it had been one time, presumably Mr.

28  Yates would have said that.  (The court appreciates that Mr. Yates used his estimates as proxies.)

C 11-01950
FINDINGS OF FACT AND CONCLUSIONS OF LAW

It is Mr. Yates's burden to show denial of access.  Thus, considering the June 10, 2013 video showing an employee helping him, the court eliminates the June 10, 2013 and August 21, 2013 visits as being consistent with Mr. Yates's testimony that the June 10 visit was typical and that towards the end, employees opened the door for him.  The court also eliminates the January 12, 2013 visit as a reasonable inference from Mr. Yates's testimony about employees helping him more recently.  The reason that the inference is reasonable is the time line of the case, which was filed in April 2011 but – because of the ADA rules – had the initial case-management conference in May 2012, when a settlement conference was ordered for January 2013 and a trial was set for March 2013.  By this point, it is a reasonable inference from the record that Mr. Yates was on everyone's radar screen to help.  Moreover, given that Mr. Yates bears the burden of showing denial of access, eliminating the January 2013 visit is a reasonable reconciliation of Mr. Yates's various descriptors for how many times the door was open: "quite a few times," "15%," and "a couple."  Eliminating the 2013 visits leaves 10 visits:  (1) <u>calendar year 2011</u>: March 8, April 12, May 13, June 29, July 20, and September 28; and (2) <u>calendar year 2012</u>:  January 8, March 11, May 14, and August 12.

For similar reasons, the court eliminates the August 12, 2012 visit as being within the time frame of employees' helping Mr. Yates more recently.  Morever, the record does not establish that Mr. Yates experienced a barrier that specific day, and Judge Armstrong's *in limine* rulings excluded a video from that day based on Plaintiff's agreement that he would not put in evidence of that visit. *See* Reply, ECF No. 50 at 4; 8/1/13 Order, ECF No. 65 at 8.  The court previously said that it would not alter Judge Armstrong's scheduling and evidentiary rulings, and in any event, Sweet Potato did not offer the video.  But from the record, Judge Armstrong's exclusion of video evidence from August 24, 2012, and the parties' argument about it, suggest that it had similar relevance as the June 2013 video on the question of whether Mr. Yates was denied access on August 24, 2012.  Under the circumstances, and given Mr. Yates's burden, the court cannot conclude that he was denied access and thus excludes the August 12, 2012 visit.

Finally, the court also eliminates two visits as a reasonable inference from Mr. Yates's testimony that the doors were propped open 5% of the time.  Again, if it were one visit, he would have said so.  He estimated twice as the equivalent of 15%.  A reasonable inference from the evidence is that the

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

doors were propped open when it was hot.  The court takes judicial notice that on July 20, 2011, and September 28, 2011, the maximum temperature at San Francisco International Airport was 80 degrees and 90 degrees, and presumably it was warmer still on Divisadero.  *See* http://www.wunderground.com/history/airport (last checked 10/25/2014).

That leaves seven visits:  (1) <u>calendar year 2011</u>: March 8, April 12, May 13, and June 29; and (2) <u>calendar year 2012</u>:  January 8, March 11, and May 14.

Another issue is whether the court nonetheless must consider statutory damages for all 13 visits on the ground that Mr. Yates encountered barriers inside the restaurant that amounted to a denial of access too.  *See* Cal. Civ. Code § 55.56(a)-(b).  On this record, Mr. Yates has not shown that he encountered barriers in the form of the high counter and the lack of accessible tables.  The video – which Mr. Yates concedes shows a typical visit – shows him signing a receipt on a tray, which was consistent with his accounting of how he paid.  The employee also helped him with his food, and Mr. Yates did not suggest difficulties that amount to a denial of public accommodation or such difficulty, discomfort, or embarrassment that allows recovery of damages under the Unruh Act or the DPA.  *See id.* § 55.56(c); *Kohler*, 2013 WL 124601 at *7.  If curbside service is an acceptable means of addressing a barrier, so too is ready employee assistance.[5]  Mr. Yates's testimony was equivocal about dining in, and it is not clear on this record that the end table with its accessible height did not afford him the ability to do so.

Thus, the court limits the universe of statutory damages to the seven visits on the sole ground that Mr. Yates encountered a barrier at the entry.

The final issue is, should Mr. Yates receive statutory damages for all seven visits.

Section 55.56 describes the statutory damages and attorney's fees that may follow Unruh Act and CDPA violations.  Under section 55.56, multiple awards may accrue to plaintiffs as a result of multiple visits to a facility.  *See* Cal. Civ. Code § 55.56(e) ("Statutory damages may be assessed . . . based on each particular occasion that the plaintiff was denied full and equal access . . . ."); *see also*

---

[5]  According to Defendants, Plaintiff raised the issue of adding an appendaged fold-down counter for the first time at trial.  *See* ECF No. 165 at 6-7.

*Yates v. Vishal*, No. 11–CV–643–JCS, 2013 WL 6073516, at *3 (N.D. Cal. Nov. 18, 2013) ("In the hotel and restaurant context, a plaintiff can recover separate statutory damages for each time a plaintiff visits (or is deterred from visiting) a non-compliant establishment . . . ."); *Grutman v. Regents of Univ. of California*, 807 F. Supp. 2d 861, 869 (N.D. Cal.2011) (quoting *Org. for the Advancement of Minorities with Disabilities v. Pacific Heights Inn*, 2006 WL 2560754 (N.D. Cal. Sept. 5, 2006)).  Awarding statutory damages for multiple occasions of discrimination at a public accommodation is permissive rather than mandatory.  *See* Cal. Civ. Code § 55.56(e) ("Statutory damages *may* be assessed . . . based on each particular occasion . . . ."); *see also Ramirez v. Sam's for Play*, No. 11–CV–1370–MEJ, 2013 WL 4428858, *8–9 (N.D. Cal. Aug. 15, 2013) (denying summary judgment on issue of multiple statutory damages).

"The California Supreme Court has stated in dicta that there may be a point at which statutory damages for each offense will be so high that equity and constitutional constraints cabin a defendant's liability under the Unruh Act." *Vogel v. Rite Aid Corp.*, No. 13–CV–288–MMM EX, 2014 WL 211789, at *11 (C.D. Cal. Jan. 17, 2014) (awarding plaintiff a total of $12,000, or $4,000 for each of plaintiff's three visits) (citing *Angelucci v. Century Supper Club*, 41 Cal.4th 160, 179-80 (2007)).  The mere existence of multiple visits does not necessarily trigger such concerns: courts frequently award damages for several visits under the Unruh Act.  *See e.g., Vishal Corp.*, 2013 WL 6073516 at *5 (awarding $12,000 based on three occasions that plaintiff visited defendant hotel/restaurant); *McCune v. Singh*, No. 10–CV–02207–JAM, 2012 WL 2959436 (E.D. Cal. July 19, 2012) motion for relief from judgment denied, 10–CV–02207–JAM, 2013 WL 3367515, at *5 (E.D. Cal. July 5, 2013) (awarding total of $16,000 in Unruh Act damages for four visits to defendant's stores); *Freezor v. Del Taco, Inc.,* 431 F. Supp. 2d 1088, 1091 (S.D. Cal. 2005) (same).

Even if equitable or constitutional concerns do not prohibit the award of multiple statutory damages, the court must consider whether Yates has met his duty to mitigate damages. Cal. Civ. Code § 55.56(g) ("[Section 55.56] does not alter . . . any legal obligation of a party to mitigate damages."). "One way that plaintiffs may fail to meet their duty is to make multiple visits to the same facility before they could reasonably expect that the barrier was corrected; this is sometimes referred to as stacking." *Vishal Corp.*, 2013 WL 6073516 at *4.  In *Ramirez*, for example, the court

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1   denied summary judgment for plaintiffs on the issue of multiple statutory damages because a factual

2   question remained as to whether plaintiffs had met their duty to mitigate their damages. *Ramirez*,

3   2013 WL 4428858 at *8.  The *Ramirez* plaintiffs were entitled to one award for their first visit to the

4   non-compliant facility, but the court found that the fact that they increased the frequency of their

5   visits just prior to filing suit — up from eight times per year to three times in one month — created a

6   fact question regarding mitigation. *Id.*; *see also Vishal Corp.*, 2013 WL 6073516 at *4 (describing

7   *Ramirez* holding).

8       At trial, Defendants questioned Mr. Yates about his multiple visits to the restaurant, including

9   his three visits before he filed his initial complaint on April 11, 2011:  March 9, 2011, March 21,

10   2011, and March 30, 2011.  In addition, they questioned him about his 189 prior disability lawsuits

11   and prior settlements, arguing that these establish a pattern of abusive or predatory litigation where

12   Mr. Yates maximizes or stacks statutory damages by paying multiple visits to non-compliant

13   businesses before he can reasonably expect barriers to be removed.  Their point is that this

14   inappropriate behavior is relevant to his credibility about harm, establishes that he generates income

15   through the serial filing of lawsuits to extract income from businesses, and precludes him from

16   multiple statutory damages awards.  They also point out that Mr. Yates's explanation that he likes

17   the chicken is not credible, given that two other Popeyes are closer to his home in Marin, including a

18   store on Fillmore Street (and thus available to him on his repeated trips to San Francisco).  Plaintiff

19   countered with testimony about Exhibit 48, which lists public accommodations that Mr. Yates

20   "fixed" by letter, meaning, he sent a letter advising the places of public accommodation about the

21   barrier, they fixed the barrier, and he never sued.

22       As a general matter, prior lawsuits are inadmissible to show that the plaintiff is litigious. *See*

23   *Henderson v. Peterson*, 2011 WL 2838169, at *6 (N.D. Cal. July 15, 2011).  It is inadmissible

24   character evidence. *Id.*  But it is admissible for impeachment during cross-examination. *See United*

25   *States v. Gay*, 967 F.2d 322, 328 9th Cir. 1992).  Here, Mr. Yates's filing of his prior disability

26   lawsuits, where he alleges identical injuries, bears directly on his credibility. *See Otto Commerce St.*

27   *Capital*, No. 12-2472, 2013 WL 2357623, at *2 (E.D. Pa. May 29, 2013); *Tomaino v. O'Brian*, 315

28   F. App'x 359, 361 (2d. Cir. 2009).  Similarly, filing lawsuits to extract settlements is probative of

UNITED STATES DISTRICT COURT
For the Northern District of California

1    credibility too.  *See Marcis v. Reinauer Transp. Cos.*, 397 F.3d 120, 125 (2d Cir. 2005); 8/1/13

2    Order, ECF No. 65 at 6-8 (collecting cases to support this point).

3         The court exercises caution and does not construe Mr. Yates's prior litigation against him.  The

4    court also does not question Mr. Yates's representation of himself as an activist who challenges lack

5    of access by first trying to resolve situations without litigation by sending letters to places of public

6    accommodation, asking them to fix the barriers, and then declining to file lawsuits if the places of

7    public accommodation fixed the barriers. *See* Ex. 48 (68 examples of letters).  But he did not do so

8    here on the ground that Popeyes is a franchise.  He also never mentioned access issues to anyone on

9    any of his visits.  But he kept receipts to keep track of when changes to the alleged architectural

10   barriers were made, which suggests documentation of visits in aid of litigation to obtain multiple

11   statutory damages awards.  Deposition, Ex. 86, at 5, 6, 18.

12        The pattern of Mr. Yates's visits to the Popeyes also suggests stacking damages.  Mr. Yates

13   visited the store three times in 2011 before he filed his initial complaint on April 21, 2011: March 8,

14   March 21, and March 30.  *See* ECF No. 1 (charging only these visits).  These three visits also were

15   charged in the first amended complaint filed in June 2012, which added five more 2011 visits in the

16   same time period:  April 21, April 26, April 30, May 4, and May 13.  *See* ECF No. 2011.  Mr. Yates

17   did drop six 2011 visits right before trial:  March 21, March 30, April 5, April 26, April 30, and May

18   4.  *See* ECF No. 137 at 1-2.  He did so to show that he was mitigating damages, probably because

19   multiple visits at the time a plaintiff files a complaint looks like stacking damages.  But their

20   persistence in the litigation right up to trial is relevant, particularly given Mr. Yates's  failure to

21   follow his normal practice of complaining.

22        Also, Mr. Yates's rationale for dropping the six 2011 visits extends to the April 12 and May 13,

23   2011 visits.  Defendants answered the complaint on June 10, 2011, which means that – like the six

24   dropped visits – these two visits were before Defendants had notice (in the form of service) about

25   the barriers.  Again, this looks like stacking damages.  Moreover, the June 29, 2011 visit is close in

26   time to service and Defendants' answer, and that raises the question of whether it is appropriate to

27   award damages for that visit given that remediation could not reasonably be achieved at that point.

28   *Cf.* Cal. Civ. Code § 55.56(f)(2) (reducing statutory damages if a defendant corrects all construction-

UNITED STATES DISTRICT COURT
For the Northern District of California

1    related defects within 30 days of being served). The court does hold that at minimum, Mr. Yates is

2    entitled to statutory damages for his March 8, 2011 visit.

3        One might argue that the remaining visits in 2012 are stacking too. The visits were January 8,

4    March 11, and May 14, 2012, and they were added by the first amended complaint filed on June 12,

5    2012, just a couple of weeks after the initial case-management conference and setting of a settlement

6    conference date in January 2012. *See* ECF No. 19. One might construe this as an attempt to

7    leverage settlement.

8        Another issue is whether Mr. Yates's expert's mistake about remediation is relevant to the award

9    of statutory damages for multiple visits. Plaintiff's expert, who testified that 99% of his business

10   was for Plaintiff's counsel, said in his report that the landing in front of the door needed to be

11   remediated and suggested that Sweet Potato work with the City of San Francisco to raise the

12   sidewalk or install a ramp. *See* Ex. 3, 7/21/11 Report, at 2. At trial, he said that this was a mistake

13   and that his report should have said that Popeyes could not put in a ramp. But this mistake persisted

14   as Plaintiff's theory of remediation throughout the litigation. *See, e.g.*, Second Amended Complaint,

15   ECF No. 89, ¶¶ 14, 20 (asserting the slope as an architectural barrier). Only on the eve of trial did

16   Plaintiff stipulate that correcting the slope was not readily achievable.

17       The result of this mistake was that the litigation appears to have become stuck on Plaintiff's

18   reiteration that remediation required fixing the sidewalk, a structural feat that was not readily

19   achievable. On this record, it appears that Mr. Chen did not know how to address this issue, could

20   not get a loan to re-image the restaurant and address the alleged access issues given the pending

21   lawsuit, and ultimately figured a workaround by getting his brother to take over the business. That

22   gave Sweet Potato the ability to get the loan to accomplish the re-imaging that also took care of all

23   Plaintiff's suggested remediation (valued by Sweet Potato's expert in 2011 as costing around

24   $36,000). The reality is that the fix was much easier and cheaper because the main access issue

25   turned out to be only the door. Plaintiff's mistake meant that the litigation dragged on with a

26   considerable and unnecessary expenditure of resources by everyone and prevented the problem from

27   being addressed early in the litigation, which is how most ADA cases (including Mr. Yates's other

28   cases) resolve under the ADA rules.

UNITED STATES DISTRICT COURT
For the Northern District of California

1    In sum, the court is not sure that dropping the six visits from 2011 demonstrates the restraint that

2    is mitigation of damages, especially considering the failure to send a warning letter, the failure to

3    complain about barriers, the pattern of visits initially alleged in his first complaint, and Mr. Yates's

4    repeated visits and amended complaints at strategic moments that look like stacking damages to

5    leverage settlement.  The issue is compounded by Mr. Yates's maintaining (through his complaints

6    and case-management statements, in what the expert conceded at trial was a mistake) that the

7    sidewalk needed to be leveled or a ramp installed, when in fact, that was not readily achievable.

8    On the other hand, both Defendants bear some responsibility for the 43-month delay between

9    complaint and remediation.  It is not clear why it took so long to install the buzzer and implement a

10   policy of having employees open the door for visitors who need assistance (or to put in a power

11   door).  The court is also sympathetic to a denial of access that persists (and can be compensated)

12   over multiple visits.  The question is where – under the unique facts of this case – should the court

13   draw the line, given that awarding damages for multiple visits is permissive.

14   Defendants briefed the issue, but Plaintiff did not.  Given that landscape, the court orders the

15   following.  The seven visits that potentially merit awards of statutory damages are as follows: (1)

16   calendar year 2011: March 8, April 12, May 13, and June 29; and (2) calendar year 2012:  January 8,

17   March 11, and May 14.  Counsel must meet and confer at least by telephone to see whether – given

18   this order – they want to revisit their settlement positions and must specifically discuss (1) the

19   impact that the expert's mistake had in their prior negotiations, (2) what impact that should have, if

20   any, on the suitability of damages recovery for these seven multiple visits, (3) the interplay with

21   attorney's fees that Plaintiff is entitled to, and (4) how Sweet Potato's and the Ng Trust's delay in

22   addressing the access issues affects the analysis.  The court notes that the public record reflects that

23   the parties came close enough to settling the case that they notified the court that they had settled,

24   see ECF No. 117, which suggests that they could settle the case now.  After counsel's meet-and-

25   confer, counsel must discuss the settlement issues and risks with their clients.  The parties must

26   complete this process by November 7, 2014.

27   If the case does not settle by November 14, 2014, Plaintiff's counsel must file a brief of no more

28   than seven pages on the subject of whether Mr. Yates ought to receive statutory damages for all

UNITED STATES DISTRICT COURT
For the Northern District of California

seven visits or a subset of the seven, and why.  By November 20, 2014, Defendants may (but need not) file a three-page reply.

### CONCLUSION

Defendants are liable to Mr. Yates for statutory damages of $4,000 for at least the March 8, 2011 visit.  The parties must meet and confer by November 7, 2014 to discuss settlement.  If the case does not settle, the briefing schedule on the issue of damages is as follows: (1) Plaintiff's seven-page brief due on November 14, 2014; and (2) Defendants' optional three-page reply brief due on November 20, 2014.  After the court considers the arguments, it will issue an order with its final damages award, direct the parties to submit a proposed form of judgment, and set a briefing schedule for Plaintiff's motion for fees and costs.

**IT IS SO ORDERED.**

Dated: November 3, 2014

LAUREL BEELER
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
For the Northern District of California